MATERIAL SERVICE CORPORATION *et al.*, Appellees, *vs.*
GEORGE B. McKIBBIN, Director of Finance, *et al.*, Appellants.

*Opinion filed September 21, 1942.*

George F. Barrett, Attorney General, (Albert E. Hallett, and William C. Wines, of counsel,) for appellants.

Harold R. Schradzke, Kirkland, Fleming, Green, Martin & Ellis, Robert Thorsen, Edward P. Madigan, George E. Thomas, England, O'Toole & Kays, and Hovey & Ely, (Joseph B. Fleming, Edward C. Caldwell and Manly K. Hunt, of counsel,) for certain materialmen, appellees.

David & Fainman, (Sigmund W. David, and James J. Glassner, of counsel,) for certain contractors, appellees.

Mr. Justice Murphy delivered the opinion of the court:

This is an appeal from a decree entered in the circuit court of Cook county. In general it involves the tax liability under the Retailers' Occupation Tax act (Ill. Rev. Stat. 1941, chap. 120, par. 440 *et seq.*) of certain phases of the business of those groups known to the building industry as materialmen and contractors. For a better understanding of the various contentions it is necessary to make reference to the several groups who are parties to the case and the procedure by which they became parties.

In February, 1939, Material Service Corporation and two other corporations filed a representative action against the State Director of Finance, State Treasurer and Attor-

ney General to enjoin them from collecting certain taxes and for an accounting as to refund of taxes wrongfully collected. Their occupations were described as selling sand, gravel, cement, stone and other aggregates to general contractors and subcontractors to be employed by such vendees in the construction of buildings and other improvements. In support of the representative feature of the action the complaint contained a prayer for an injunction to restrain those persons who were engaged in the same occupation as plaintiffs from instituting or prosecuting any suit which involved the same principle as was included in plaintiffs' action.

The complaint was amended in various ways particularly to extend the action to include the occupation of selling practically all kinds of material used in the building industry. The Allied Lumber Company, *et al.,* Joseph Lumber Company, *et al.,* Adams Building Material Company, *et al.,* and Czerwiec co-partners, *et al.,* had separate suits pending, all of which involved validity of an occupational tax on the same character of occupation as was described in plaintiffs' amended complaint. These latter cases were consolidated with the Material Service case. The claims and contentions of the plaintiffs in the several actions are substantially the same. When reference is made to plaintiffs, it includes the plaintiffs in all the consolidated cases. Any reference made to "materialmen" will be considered as referring to those persons engaged in the same occupation in which plaintiffs were engaged as shown by this record.

After the order of consolidation referred to was entered, a number of general contractors, which included the full membership of eight building contractors' associations, were permitted to intervene. A separate action, instituted by the 119 other general contractors, was pending against the same State officials, in which the right to exact an occupa-

tion tax on the occupation of a contractor when selling fixtures was questioned. They prayed for a repayment of money paid as taxes and held by the State Treasurer in the protest fund under section 2a of the act in relation to payment of public money into the State Treasury. (Ill. Rev. Stat. 1941, chap. 127, par. 172.) The court, on its own motion, consolidated this latter action with the Material Service case. Although these parties were not intervenors, their interests as to taxable liability are identical with those of persons who were permitted to intervene and they will all be referred to as intervenors. Any reference to contractors will be considered as referring to those persons engaged in the same occupation in which it is shown intervenors were engaged.

The decree appealed from adjudged that neither of the occupations of materialmen or contractors were within the act. The collection of the tax was enjoined. As to the 119 contractors who had the separate actions and who had paid their taxes under protest, the decree directed the State Treasurer to refund the same from the protest fund. As to those who asked for refund under section 6, appropriate provision was made for further hearing and jurisdiction was retained for that purpose. This appeal is prosecuted by the State officials from that decree and said officials will be referred to as defendants.

The cause was referred to a master in chancery and a vast amount of evidence was introduced. It gives in detail the method and manner in which materialmen and contractors, such as plaintiffs and intervenors, generally conducted their respective businesses and the relation those occupations bore to the building industry. A trial certificate, which will be given the effect of a stipulation of fact, appears in the record. It draws important conclusions of fact, and has saved the court a vast amount of detailed examination of the evidence. It shows that in the building

industry the business of materialmen and contractors, such as plaintiffs and intervenors, generally follows well established lines of practice.

That the principles herein announced will not be given an application broader than the evidence upon which they rest, it is necessary to state certain pertinent facts and the conclusions the parties have conceded should be drawn therefrom.

It is said that "materialmen" means any persons engaged in the business of producing, manufacturing and selling, or of selling, to contractors the material usually sold by dealers engaged in the sale of building material and which material when sold to a contractor subsequently enters into the construction project, whatever it might be, and becomes an integral part thereof. "Materials" means all of the tangible personal property, including fixtures, which enters into a structure. "Fixtures" include such things as air compressors, ash hoists, awnings, bathtubs, sectional boilers, prefabricated cabinets, clocks, closet combinations, electric motors and special control apparatus, electric space heaters, fans, fire hose, furnaces, plumbing fixtures and other articles of a similar character. "Structure" includes any building, house, edifice, tunnel, sewer, highway, road, bridge or any other type of structure or any part (including plumbing, heating, ventilating, refrigerating and air conditioning systems) thereof, or any other improvement to real estate. "Contractor" means any person engaged in the occupation of entering into and performing construction contracts in the manner therein described. The term includes general contractors, subcontractors and specialized contractors. For the purposes here, the specialized contractor is a plumbing, heating, ventilating, refrigerating or air-conditioning contractor and may, or may not, be a subcontractor.

It is said that the practice is that an owner of real estate who contemplates making an improvement has plans and specifications prepared and asks contractors to submit

bids for the construction and erection of the improvement in accordance with such plans and specifications. The acceptance of a bid by the owner is followed by the making of one of three prevailing types of construction contracts: (A) Contractor to furnish all material, labor, skill and supervision and do everything necessary to the completion of the structure in accordance with the plans and specifications. He is free to purchase material from materialmen of his own selection and to employ necessary help without control of the owner. The character of materials furnished and the work done is subject to supervision, acceptance or rejection by the owner or his agent. Provision is made for partial payments and for final payment upon completion of the work. Contract (B) is what is termed a cost plus contract and is substantially the same as contract (A) except as to the manner of computing consideration to be paid the contractor. Under this form the total cost of material, labor and other charges, plus the contractor's percentage, fixes the contract price. Contract (C) generally refers to the construction of paving, bridge building and similar construction of public works and is referred to as the unit-price contract and is substantially the same as contract (A) except that instead of a specified lump sum the contract price is based upon the number of units of materials furnished and installed in the structure. In the case of a specialized contractor who enters into a contract with a general contractor or with the owner to install an improvement of a specialized line, the work is done from plans and specifications. The terms of the contract are not considered as fulfilled until the system to be furnished or installed has been tested and is ready for operation by the owner. The specialized contract provides that the owner may exercise the right of selection as to the type of fixtures or other articles to be installed. It is agreed that the occupation of the contractor as herein defined is limited to the furnishing of materials pursuant to a con-

tract as above described. It is agreed for purposes here, that subcontractors stand in much the same relation to the general contractor as the latter stands to the owner, but that the subcontractor in his purchase of material from the materialman stands in the same relation to the materialman as the contractor.

The contractor or a subcontractor, after making a contract, buys material for the structure from materialmen and the transaction in reference to the purchase of such material is solely between the contractor and the materialmen. It is made on the contractor's credit subject only to the materialman's right under the Mechanic's Lien act. No contractual relationship exists between the materialman and the owner or any person other than the contractor. The materialman delivers the material to the contractor at the site where the structure is to be constructed or at a place designated by the contractor. The title to the material passes to the contractor upon delivery. In certain instances the contractor does not buy from materialmen but takes material out of his own stock which has accumulated from purchases for other structures. All materials purchased by the contractor from materialmen or taken from the accumulated stock are incorporated as integral parts of the structure by the contractor and, at the time the materials are so incorporated in the structure, the title to the materials passes from the contractor to the owner.

The contractor or subcontractor furnishes all the labor necessary to the mixing and the making of concrete, cutting of stone, fitting of brick and other items which become a part of the structure. None of the materials herein involved is physically or chemically destroyed by mixing, shaping, attachment or placement by the contractor. Upon the passing of title to the structure and the materials contained therein to the owner, he proceeds to permanently enjoy it with all the rights of an owner.

A contractor, particularly in his supervisory service, uses and applies scientific and engineering principles and experience. Intervenors, who are contractors, subcontractors or specialized contractors, purchase the materials needed in their work from persons engaged in a business similar to the plaintiffs. It is said that in the installation of plumbing, heating, refrigerating, ventilating or air-conditioning systems, contractors or specialized contractors must design, construct and install the same in accordance with scientific facts.

Under the authority to make rules, granted the Department of Finance under section 12 of the act, it promulgated rule 6 which pertained to the taxable liability of those persons engaged in the same occupation as plaintiffs and intervenors. Since it was first adopted in 1933, rule 6 has undergone changes which shifted the taxable liability from the materialmen, where it was declared to be in the first instance, to the contractor and then on February 2, 1938, to a division of liability based upon the character of the items of personal property that were being transferred. It is evident the several changes in the rule were made to meet the department's interpretation of this court's holding in *Bradley Supply Co.* v. *Ames,* (1934) 359 Ill. 162, *Blome Co.* v. *Ames,* (Feb. 1937) 365 id. 456, and *Herlihy Mid-Continent Co.* v. *Nudelman* (Dec. 1937) 367 id. 600.

The original rule 6, which became effective soon after the effective date of the act, July 1, 1933, is set forth at length in the *Bradley case, supra.* The test in that case was as to the taxable liability of those engaged in the occupation of selling plumbing supplies to contractors. It was held such occupations were not subject to tax. The ruling in that case as to that occupation has not been changed or modified. The interest of contractors was not before the court.

After the opinion was filed in the *Bradley case,* rule 6 was changed, effective March 1, 1935. In its amended form the liability of the occupation of the materialman was omitted but it declared that there was a taxable liability imposed by the act on the occupation of the contractor as to the materials he purchased from materialmen and which he used in the construction of the improvement for the owner. The validity of that rule was tested in the *Blome case, supra.* That action was brought by persons engaged as general and subcontractors in practically all the building trades. The interest of the materialman was not represented in that case. Insofar as the rule provided for the imposition of a tax upon the occupation of contractors in transferring tangible personal property to an owner it was sustained, but the part of the rule which declared taxable liability under certain conditions upon the occupation of a contractor to include labor as well as personal property was held bad. A few months after the *Blome case* was disposed of, the *Herlihy case, supra,* was before this court. It involved the taxable liability of contractors engaged in the occupation of making concrete structures and other improvements where, in the making of such structures, the separate identity of the component parts of the structure was destroyed, as for illustration in the making of a concrete structure the identity of the sand, gravel and cement from which it was made was lost. The opinion in the *Herlihy case, supra,* expressly overruled that part of the *Blome case* as applied to the construction work in which plaintiffs in the *Herlihy case* were engaged. In thus restricting the effect of repudiation of the *Blome case* to the occupation indicated, the court was undertaking to limit it to the occupations of the parties who were then before the court.

Thereafter the department amended rule 6, effective February 2, 1938. This rule provided in part as follows:

"Persons who sell *materials* to contractors, sub-constractors or real estate owners for use by them in the construction, erection or repair of buildings, fundations, roads or other improvements are liable for tax with respect to their gross receipts from sales of such Materials. Contractors are the 'persons using' materials and are not subject to tax with respect to their receipts from labor, and materials furnished by them under contracts to improve real estate.

" 'Materials' are defined as tangible personal property which, when combined with other tangible personal property, loses its identity to become an integral and inseparable part of a completed structure. 'Materials' include such things as:

| | | |
|---|---|---|
| Bricks | Mortar | Stone |
| Builders' hardware | Oil | Stucco |
| Cement | Paint | Tile |
| Flooring | Piping, valves and | Wall board |
| Glass | pipe fittings | Wall coping |
| Gravel | Plaster | Wall paper |
| Insulation | Putty | Weather stripping |
| Lath | Reinforcing mesh | Wiring |
| Lime | Sand | Wood preserver |
| Lumber | Steel | |
| Millwork | | |

"On the other hand, contractors who furnish and install fixtures are making sales at retail and must pay to the Department with respect to the selling price of such fixtures.

" 'Fixtures' are defined as things which are necessary to a building * * * and which do not lose their identity as accessories when placed or installed. 'Fixtures' include such things as:

| | | |
|---|---|---|
| Air compressors | Conveying equip- | Hot water tanks |
| Air conditioning | ment | Laundry tubs |
| compressors, | Drinking fountains | Radiators |
| motors and fans | Engines | Venetian blinds |
| Awnings | Fans | Window screens |
| Bathtubs | Fences | Window shades." |
| Boilers (sectional) | Fire alarm fixtures | |
| Cabinets | Furnaces | |
| (prefabricated) | Gasoline pumps | |
| Clocks | Hot water heaters | |

The first question for consideration is as to the right of certain plaintiffs to maintain a representative action. Of the many suits now included in the consolidated action, as well as all claims made by the intervenors, the repre-

sentative feature of the class action is limited to the action of the Material Service Corporation and its two co-plaintiffs. The decree appealed from supports the right of the Material Service Corporation and its original two co-plaintiffs to maintain a representative action but since the entering of that decree this court held in *Peoples Store of Roseland* v. *McKibbin,* 379 Ill. 148, that a class suit can not be maintained in this character of case. The holding in that case is controlling and the decree appealed from is as to that part erroneous.

The various amendments of rule 6 indicate the changes were somewhat influenced by the thought that if there has been a sale of tangible personal property at retail, there must be a basis for a tax. Reference to the opinions of this court shows that it has been repeatedly said that not all vendors of personal property are subject to the act. (*Herlihy Mid-Continent Co.* v. *Nudelman, supra; Babcock* v. *Nudelman,* 367 Ill. 626; *American Optical Co.* v. *Nudelman,* 370 id. 627.) The changes in the rule, as well as statements in some of the briefs, indicate a belief that where the title to an item of tangible personal property is transferred by a series of transactions from one party to another and finally to an ultimate user or consumer, if one vendor is not liable for tax the other must be. In *Revzan* v. *Nudelman,* 370 Ill. 180, it was said: "In order to impose a tax on anybody under the act, the facts must bring such party within its terms, without regard to the non-liability of anybody else. To hold that one party is liable to a tax because another party is not liable, would be an anomaly in the law." Furthermore, we are prompted to repeat that the tax authorized by the act is a tax upon certain occupations and not a sales tax. Evidence of a sale of personal property at retail is a necessary element to the establishment of a tax and is material in determining whether a person making such sale is engaged in an occu-

pation which is subject to the tax, and the amount of the sale price measures the amount of the tax, but such elements do not form the basis for the levying of the tax. That is dependent solely upon the occupation of the one from whom the tax is exacted. *Mallen Co.* v. *Department of Finance,* 372 Ill. 598; *Brevoort Hotel Co.* v. *Ames,* 360 id. 485; *Franklin County Coal Co.* v. *Ames,* 359 id. 178; *Reif* v. *Barrett,* 355 id. 104.

No question is raised as to the taxable liability of the plaintiffs on the occupations that they were engaged in when selling materials direct to users and consumers such as home owners, industries, governmental agencies and like vendees. It is stated in the brief that such business represents about thirty-six per cent of the total business transacted by the plaintiffs. Therefore, the scope of the inquiry is restricted to that part of plaintiffs' occupation where they were engaged in selling building material and supplies to contractors, subcontractors or specialized contractors who have contracts with owners under the terms and conditions shown in the stipulation.

In 1941, section 1 of the Retailers' Occupation Tax act was amended by adding certain subparagraphs in which more detailed definitions of some of the terms used in the act were set forth. These additions included a more detailed statement as to what was meant by "sale at retail" and the phrase "use or consumption." However, the questions presented on this record pertain to the statute as it existed prior to the amendment. The rules in question were adopted under the prior act and the decision will be upon the act as it then existed.

Section 2 of the act provides that a tax shall be imposed upon persons engaged in the business of selling tangible personal property at retail. The first paragraph of section 1 defines sales at retail to mean "any transfer of the ownership of, or title to, tangible personal property to

the purchaser, for use or consumption and not for resale in any form as tangible personal property, for a valuable consideration."

The main contentions urged by appellants are advanced in support of rule 6 as adopted February 2, 1938. Although some of the parties asked for refund of taxes paid under the prior rules, what is said as to the rule of February 2, 1938, will dispose of all contentions made. The first point is as to the distinction of liability the rule makes between those articles designated materials and those termed fixtures. Is the materialman engaged in a taxable occupation when he is selling brick, lumber and such articles to a contractor and in a non-taxable occupation when he is selling a contractor plumbing supplies and similar articles? Also, is the contractor engaged in a taxable occupation when he sells and installs a bathtub in a house for an owner and in a non-taxable occupation when he sells and fabricates into the wall of the house items such as brick and lumber? The distinction between a piece of wood that forms an integral part of a building and which can not be removed without damage to the remainder, and a bathtub which may be detached without particular damage to the building is well known. But can it be said that the distinction between the two classes of articles finds support in the statute? Without undertaking to give a comprehensive definition of what constitutes a fixture, it is sufficient for purposes here to say that the term is usually applied to articles that were once items of tangible personal property which have been physically attached to the real estate by someone having an interest in the soil so that they become a part thereof. As to whether an article has become a fixture depends upon many things, the principal one of which is the manner of attachment of the article to the realty. If it is attached by one who has a limited estate in the realty, as to whether it becomes a fixture or not may depend upon the intention ·of the owner and the one attaching the article to the soil.

The items designated as "fixtures" and those as "materials" are, under the stipulated facts, sold under the same terms, title passes under the same conditions, and both are incorporated into the structure for use or consumption by the owner. Thus it will be seen that the distinction made by the rule rests upon the feature of the detachability of the article. Whether an article is detachable as a fixture or whether it is such an integral part of the structure that it can not be detached is not the answer to the basic question as to whether there has been a sale of tangible personal property at retail within the meaning of the act. The character of the use a purchaser makes of an article of personal property is important in determining whether it was a sale to him for his use or consumption, but the effect the use has upon the article, or as in this case the effect of the process applied by the contractor, is of no consequence. There is no distinction in this regard between the brick the contractor has used as an integral part of the building and the bathtub he has installed. The object and purpose the contractor and owner have is to have a completed structure for the use of the owner and if it is a character of structure that to complete requires the installation of articles which when completed will be fixtures, such items as to taxable liability are of the same character as the items of material that are fabricated into the whole to make the completed structure. It is the use and purpose for which the article has been purchased that controls. Under the facts here, the use and purpose for which the various items are purchased is to have the completed structure for the use of the owner. The fact that the items designated as fixtures may be more easily detached than those designated as materials, or that one has a greater percentage of salvage value than the other does not support the differentiation that the rule makes between the two items.

In the *Bradley case, supra,* approval was given to the principle that the article of sale, which in that case was

plumbing supplies, would in the use and consumption that was to be ultimately made of them become fixtures, thereby losing their identity as personal property. But the approval of the principle did not form the basis for the conclusion. It is expressly stated that the question was as to whether it was a sale at retail within the meaning of the term as used in the act. What was said in the *Herlihy case, supra,* as to the use of sand, gravel and cement used by the plaintiffs in that case in their occupation as contractors, was said in reference to the use and consumption the purchasers were to make of them to determine there had been a sale at retail within the meaning of the act.

We do not find support in the act for the distinctions the department has made in rule 6 between the items declared to be materials and those stated to be fixtures.

The next question is as to the taxable liability of plaintiffs as to that part of their business where they sell building materials to contractors under the terms stated in the stipulation of facts. In view of what has been said, no distinction will be made between those supplies designated in rule 6 as "materials" and those referred to as "fixtures." The stipulation of facts discloses that the title to the supplies sold to the contractor passes to him when the articles are delivered. The delivery may be at the site of the structure or at a place designated by the contractor. The mere transfer of title accompanied by delivery of possession does not measure an occupational tax unless the contractor has acquired the supplies for his use or consumption and not for resale. It is said the contractor employs the building supplies to fabricate the completed structure and that in so doing the supplies are used by him. In a sense that is correct but it is not every use that comes within the meaning of that word as employed in the statute. As pointed out in *Revzan v. Nudelman, supra,* the popular and usual sense in which the word "use" is employed means a long-continued possession and employment of a thing to

the purpose for which it is adapted as distinguished from a possession and employment that is merely temporary. That case was an action by a wholesale leather merchant to enjoin the collection of a tax on the business of selling leather to shoe repairmen. It was held that the employ- ment of the leather by the repairman in repairing shoes for a customer was not the character of use contemplated by the legislature. Also, *Bradley Supply Co.* v. *Ames, supra.*

Emphasis is placed upon the meaning of the word "consumption" as used in the statute and particularly as applied to those articles of building material such as sand, gravel and cement, whose separate identity is destroyed in the process which the contractor applies. In the *Revzan case,* it was said: "Webster's Unabridged Dictionary defines 'consume' as to use up; expend, waste, exhaust. It defines 'consumption' as the use of economic goods resulting in the diminution or destruction of their utility. 'Consumption may consist in the active use of goods in such a manner as to accomplish their direct and immediate destruction, as in eating food, wearing clothes or burning fuel' is given as an example. Under the rules of statutory construction, the term 'consumption' must be interpreted in its usual and popular meaning—*i.e.,* destruction by use." Under the construction given to the word "consumption" in the cases cited it can not be said the contractor consumes the various items of building material. Some of the items sold may lose their separate identity, but their value and usefulness has been increased by the process which the contractor has applied. He purchases them for the purpose of processing and adding to a structure which he has agreed to make for and deliver to the owner. This is not a consumption of the articles within the meaning of that word as employed by the statute in question.

The user or consumer contemplated by the statute is the ultimate user or consumer who will use the articles as long as they last, or until he desires to do away with them.

(*Bradley Supply Co.* v. *Ames, supra; Revzan* v. *Nudelman, supra.*) The non-liability for an occupational tax, which was held in the *Bradley case, supra,* to cover materialmen whose occupations were selling plumbing supplies, is sustained and the rule announced there is held to extend to and include all materialmen when engaged in the business of selling building materials and supplies to contractors under the facts shown in the stipulation.

In view of the holding that there is no basis for a distinction as to tax liability based solely upon the difference between the items designated "materials" and those described as "fixtures," we will, for purposes of clarification, discuss the taxable liability of contractors. The intervenors contend that under the facts a contractor's occupation is the rendering of a service and not the selling of tangible personal property for use or consumption at retail. If the facts support the claim that the contractor's occupation is one of service and not of the selling of tangible personal property, then the cases amply support intervenors' contention. In *Mahon* v. *Nudelman,* 377 Ill. 331, it was said: "that to render a vocation taxable under the act, it must appear that the business of the taxpayer is that of selling tangible personal property rather than rendering service." It has been held there is no taxable liability where the articles sold are a mere incident to the practice of a profession, (*Babcock* v. *Nudelman, supra,*) or to the performance of personal services requiring skill or artistic ability. *Burgess Co.* v. *Ames,* 359 Ill. 427; *Adair Printing Co.* v. *Ames,* 364 id. 342; *A. B. C. Electrotype Co.* v *Ames,* 364 id. 360.

A contractor holds himself out to the public as having the skill and knowledge necessary to the construction of certain improvements. He does not represent himself as being engaged in the business of selling building material. The stipulation shows that the material is purchased by

the contractor after the contract with the owner is made. The purpose of the owner in seeking a contractor is to obtain a dependable one who possesses the skill, knowledge and experience necessary to the construction of the improvement at a contract price. Of the many articles used in the plaintiffs' industry, the contractor does not undertake to sell any to the owner except those which are essential to the completion of his contract. This court has held that the business of making blue prints is an occupation of service (*Burgess Co.* v. *Ames, supra,*) and also the business of commercial printing (*Adair Printing Co.* v. *Ames, supra,*) and the business of making electrotypes, stereotypes and matrices (*A. B. C. Electrotype Co.* v. *Ames, supra,*) and the business of repairing, remodeling or restyling fur coats and other fur pieces is a skilled service. (*Mahon* v. *Nudelman, supra.*) The occupation of a contractor is the rendering of a service of skill and is not subject to the tax. In arriving at this conclusion we adhere to the distinction made in *Mahon* v. *Nudelman, supra,* between the cases cited and followed and that line of cases where it was held that the service rendered was an inseparable part of a commercial transaction and an incident to it, such as *Brevoort Hotel Co.* v. *Ames, supra,* and *Swain Nelson & Sons Co.* v. *Department of Finance,* 365 Ill. 401.

The 119 contractors who joined in a separate action to recover the money they had paid as taxes under protest obtained an injunction restraining the State Treasurer from distributing such funds under paragraph 172. (Ill. Rev. Stat. 1941, chap. 127, par. 172.) In the consolidated case, the decree appealed from directed the State Treasurer to repay to the 119 contractors the amounts so paid. No question has been raised on this appeal as to that part of the decree. The questions presented as to those parties were limited to their taxable liability. Under the holding that there was no liability for tax against the occupation of

contractor and no issue having been presented as to their right to be paid from the protest fund, the part of the decree directing the State Treasurer to pay is affirmed.

As to the other parties who asked for a refund under section 6 of the act, the decree retained jurisdiction to hear such matters after the question of tax liability had been determined. The cause will have to be remanded for further hearings on the refund features. Such hearings will necessarily be conducted in accordance with the provisions of section 6 of the act, as amended in 1941, and the holding in *Peoples Store of Roseland* v. *McKibbin, supra.*

For the reasons assigned, the decree is reversed as to the right of Material Service Corporation and its two co-plaintiffs to maintain a representative action. As to all other matters the decree is affirmed. For further proceedings in reference to the claims for refunds, the cause is remanded.

*Affirmed in part, reversed in part, and remanded, with directions.*